# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

**STEVEN J BROLIN**                                                        **CIVIL ACTION**

**VERSUS**                                                                          **No. 25-1944**

**CAPITAL ONE, N.A., ET AL.**                                      **SECTION I**

## ORDER & REASONS

Before the Court is a motion[1] filed by Citibank, N.A. ("defendant") to compel arbitration and to stay these proceedings pending arbitration. Plaintiff Steven J Brolin ("plaintiff") opposes[2] the motion and defendant filed a reply.[3] For the reasons set forth below, the Court grants the motion.

## I.     FACTUAL BACKGROUND

Plaintiff alleges that on August 13, 2024, plaintiff's wife, Mrs. Valerie Brolin ("Mrs. Brolin") filed a Chapter 13 bankruptcy petition in the United States Bankruptcy Court for the Eastern District of Louisiana.[4] Plaintiff "did not pursue his own bankruptcy but was listed as a spouse on his wife's petition form."[5] Three accounts in plaintiff's name were included in the bankruptcy despite exclusively containing Mrs. Brolin's consumer debt: a Capital One account,[6] a Citibank account

---

[1] R. Doc. No. 27.
[2] R. Doc. No. 30.
[3] R. Doc. No. 31.
[4] R. Doc. No. 1 ¶ 9.
[5] *Id.* ¶ 10.
[6] Capital One, N.A. ("Capital One") is also a defendant in this action, but has not yet filed a motion to compel arbitration. *See generally* R. Doc. No. 1. Experian Information Solutions, Inc. ("Experian"), TransUnion, LLC ("TransUnion"), and Equifax Information Services, LLC ("Equifax") are three credit reporting agencies which are

(the "Citibank Account"), and a Goodyear Citibank account (the "Goodyear Account").[7] Notice of these accounts was provided to creditors, and the accounts are being paid through the bankruptcy.[8]

Plaintiff alleges that when the bankruptcy petition was filed, "an automatic co-debtor stay went into effect, prohibiting creditors from acting to collect any part of a consumer debt from a person that is liable for the debt" pursuant to 11 U.S.C. § 1301(a).[9] According to plaintiff's complaint, defendant and Capital One began collection proceedings, attempting to collect the debts from plaintiff.[10] Plaintiff alleges that "[b]eginning in September of 2024," defendant reported the Citibank Account as 30 days past-due to credit reporting agencies Equifax, Experian, and TransUnion, and in December 2024, defendant reported to those agencies that the Goodyear Account was 30 days past-due.[11] Then, according to plaintiff, in February

---

likewise named as defendants in the above-captioned action, but they have not yet filed a motion to compel arbitration. *See generally id.*

[7] *Id.* ¶ 11. Defendant is the issuer of plaintiff's Goodyear Account. R. Doc. No. 27-3 at 7.

[8] *Id.* ¶¶ 12, 13.

[9] *Id.* ¶ 14. 11 U.S.C. § 1301(a) states:
> (a) Except as provided in subsections (b) and (c) of this section, after the order for relief under this chapter, a creditor may not act, or commence or continue any civil action, to collect all or any part of a consumer debt of the debtor from any individual that is liable on such debt with the debtor, or that secured such debt, unless—
> (1) such individual became liable on or secured such debt in the ordinary course of such individual's business; or
> (2) the case is closed, dismissed, or converted to a case under chapter 7 or 11 of this title.

[10] *Id.* ¶ 16.

[11] *Id.* ¶¶ 19, 20.

2

2025 defendant reported to these same credit agencies that "the [Citibank Account] had been charged off."[12]

Plaintiff further alleges that on October 17, 2024, Mrs. Brolin's bankruptcy attorney sent letters to defendant and Capital One, "notifying them that (1) the accounts were included in Mrs. Brolin's original Schedule E/F, (2) notice was sent to them by the Bankruptcy Court and (3) demanding the creditors 'cease any further attempts to collect and/or settle this debt from [Mrs. Brolin] and her non-filing spouse.'"[13] Plaintiff's complaint states that on November 17, 2024, "Mrs. Brolin's bankruptcy attorney sent letters to Capital One and [defendant] reminding them" of the allegations set forth in the October 17, 2024 letter.[14] Plaintiff claims that despite these letters, defendant "failed to reasonably investigate [plaintiff's] disputes and continue[d] to report the accounts as past due on [plaintiff's] credit reports."[15]

Plaintiff alleges that on April 3, 2025 Mrs. Brolin's bankruptcy attorney filed a dispute with credit reporting agencies Equifax, Experian, and TransUnion regarding the negative tradelines[16] issued by defendant and Capital One which listed plaintiff's accounts as past due, and informed them that the tradelines were included

---

[12] *Id.* ¶ 21.
[13] *Id.* ¶ 22.
[14] *Id.* ¶ 23.
[15] *Id.* ¶ 24.
[16] A "tradeline" is an account that is listed on a person's credit report, including information such as: the lender's name and address, the type of account, a partial account number, the current status of the account, the current balance of the account, and the account's payment history. Ben Luthi, *What Are Tradelines and How Do They Affect You?*, EXPERIAN (May 13, 2024), https://www.experian.com/blogs/ask-experian/what-are-tradelines/.

3

in Mrs. Brolin's bankruptcy.[17] Plaintiff alleges that "[u]pon information and belief, Equifax, Experian, and TransUnion forwarded plaintiff's disputes to Capital One and [defendant]."[18]

According to plaintiff, in April 2025, he attempted to finance a car through CarMax.[19] However, plaintiff states that CarMax refused to finance plaintiff's automobile purchase due to a "recent reported bankruptcy on file."[20] Plaintiff states that CarMax advised plaintiff that it had pulled his credit score, and that it was low "due to recent, multiple, serious delinquencies."[21] Plaintiff states that on August 5, 2025 he obtained copies of his credit report from Equifax, Experian, and TransUnion, and all three reports showed the accounts from defendant and Capital One as "due and owing."[22] Plaintiff claims that those were the only negative tradelines on plaintiff's credit report.[23]

Plaintiff further alleges that on August 6, 2025, defendant's debt collector, Couch Lambert, LLC, "sent or caused a collection letter to be sent" to plaintiff, and the letter claimed plaintiff owed $6,951.72.[24] Plaintiff claims that in August 2025, he requested a personal auto insurance quote from Farm Bureau Insurance, which

---

[17] *Id.* ¶ 26.
[18] *Id.* ¶ 28.
[19] *Id.* ¶ 30.
[20] *Id.* ¶ 31.
[21] *Id.* ¶ 32.
[22] *Id.* ¶¶ 33–35.
[23] *Id.*
[24] *Id.* ¶ 36.

4

declined to issue him coverage due to issues regarding defendant and Capital One's accounts reflected in his credit report.[25]

Defendant provided copies of the credit card agreement regarding the Citibank Account and the agreement regarding the Goodyear Account, which contain the arbitration agreements by which defendant argues plaintiff is bound. The arbitration provisions are identical, and each states "all Claims are subject to arbitration, no matter what legal theory they're based on or what remedy (damages, or injunctive or declaratory relief) they seek, including Claims based on contract, tort (including intentional tort), fraud, agency, your or our negligence, statutory or regulatory provisions, or any other sources of law."[26]

## II.  STANDARD OF LAW

"In adjudicating a motion to compel arbitration under the [Federal Arbitration Agreement ("FAA")], courts generally conduct a two-step inquiry." *Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 396 (5th Cir. 2006) (quoting *Webb v. Investacorp, Inc.*, 89 F.3d 252, 257–58 (5th Cir. 1996)). During the first step, the court evaluates whether the parties agreed to arbitrate the dispute. *Id.* This first step "involves two considerations: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Id.* (citing *Webb*, 89 F.3d at 258). In evaluating the second step of the analysis, courts ask whether any federal statute or policy "renders the

---

[25] *Id.* ¶ 37.
[26] R. Doc. No. 27-2 at 18; R. Doc. No. 27-3 at 12.

5

claims nonarbitrable." *Jones v. Halliburton Co.*, 583 F.3d 228, 234 (5th Cir. 2009) (quoting *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381 (5th Cir. 2008)).

Challenges to the validity of an arbitration agreement may be divided into two types. *Brown*, 462 F.3d at 396. "The first challenges the validity of the arbitration agreement itself, the second challenges the contract as a whole." *Id.* at 396–97. When the challenge is to the validity of the arbitration agreement, a federal court decides whether or not the arbitration agreement is valid. *Id.* However, when the challenge is to the validity of the contract as a whole, the challenge must go to the arbitrator. *Id.* (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 449 (2006)).

Arbitration agreements are "a matter of contract," and disputes are therefore arbitrable only to the extent an agreement to arbitrate the claim between the parties exists. *Rent-A-Center, W, Inc. v. Jackson*, 561 U.S. 63, 67 (2010). Accordingly, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002).

"Determining whether a valid arbitration agreement exists is a question of state contract law." *Trujillo v. Volt Mgmt. Corp.*, 846 F. App'x 233, 235 (5th Cir. 2021) (quoting *Huckaba v. Ref-Chem, L.P.*, 892 F.3d 686, 688 (5th Cir. 2018)). "Although there is a strong federal policy favoring arbitration, this federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Moran v. Ceiling Fans Direct, Inc.*, 239 F. App'x 931, 936 (5th Cir. 2007) (quoting *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003)). Federal common law choice-of-law rules apply to federal

question cases. *See Jackson Nat'l Life Ins. Co. v. Dobbins*, 761 F. App'x 389, 392 (5th Cir. 2019) (citing *Singletary v. United Parcel Serv., Inc.*, 828 F.3d 342, 351 (5th Cir. 2016)). The party seeking to enforce an arbitration provision has the burden to show a contract exists. *See Trujillo*, 846 F. App'x at 236.

"When determining whether a dispute is covered by the scope of an arbitration agreement, the Supreme Court has held that 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Jones*, 583 F.2d at 235 (quoting *Safer v. Nelson Fin. Grp., Inc*, 422 F.3d 289, 294 (5th Cir. 2005)). The Fifth Circuit has held that a "valid agreement to arbitrate applies 'unless it can be said with positive assurance that the arbitration clause is not susceptible of an interpretation which would cover the dispute at issue.'" *Id.* (quoting *Pers. Sec. & Safety Sys. Inc. v. Motorola, Inc.*, 297 F.3d 388, 392 (5th Cir. 2002)).

### III.   ANALYSIS

At the outset, this Court notes that plaintiff does not challenge the validity of the entire credit card agreements, rather, plaintiff only challenges the validity of the arbitration agreements contained therein.[27] Because of this, plaintiff's arguments are properly addressed by this Court rather than an arbitrator. *See Brown*, 462 F.3d at 396–97. Plaintiff does not argue that the dispute in the above-captioned action is

---

[27] *See generally* R. Doc. No. 30.

outside the scope of the arbitration agreement, or that another federal statute or policy renders these claims nonarbitrable.[28]

Defendant argues that due to a choice-of-law provision in each of the credit card agreements which were allegedly mailed to plaintiff and attached to defendant's motion to compel arbitration, South Dakota law governs any disputes arising out of the agreements.[29] Plaintiff does not dispute this argument in his opposition to defendant's motion.[30]

Pursuant to federal common law choice-of-law rules, if there is a choice-of-law agreement in the contract, then the court will follow the choice-of-law provision when it is not "unreasonable," "contrary to a fundamental policy" of the forum state, or the chosen state has "no substantial relationship to the parties or the transaction." *Jimenez v. Sun Life Assurance Co. of Canada*, 486 F. App'x 398, 407–08 (5th Cir. 2012). This Court need not discuss, pursuant to federal common law, whether or not it is appropriate to apply the choice-of-law provision because plaintiff does not contest that South Dakota law applies and has not provided any indication that any of these conditions are met.[31] *See id.* Accordingly, this Court looks to South Dakota contract

---

[28] *See generally id.*
[29] R. Doc. No. 27-1 at 6; R. Doc. No. 27-2 at 19; R. Doc. No. 27-3 at 13. The choice-of-law provisions read: "Federal law and the law of South Dakota govern the terms and enforcement of this Agreement."
[30] *See generally* R. Doc. No. 30.
[31] *See generally id.*

8

law to determine whether a valid and enforceable arbitration agreement exists between plaintiff and defendant. *See id.*

Pursuant to South Dakota law, a contract requires "(1) [p]arties capable of contracting; (2) [t]heir consent; (3) [a] lawful object; and (4) [s]ufficient cause or consideration." SD ST § 53-1-2; *Tillman*, 2024 WL 3639586 (interpreting and applying South Dakota law when deciding defendant's motion to compel arbitration).

Defendant argues that plaintiff consented to the arbitration agreements when he received notice of the agreements via mail delivery,[32] "opened the accounts, took no action to reject the arbitration agreements, and proceeded to use the accounts."[33] Defendant cites cases interpreting and applying South Dakota law as well as S.D. Codified Laws § 54-11-9[34] in support of its position that this is sufficient to create a contract between plaintiff and defendant to arbitrate this dispute.[35] Defendant also submitted two declarations by Kelly Booth ("Booth") and Andrew Grayot ("Grayot"),

---

[32] Defendant states that it mailed plaintiff a copy of the credit card agreement containing the arbitration agreement regarding the Citibank Account on October 15, 2015, and that it mailed plaintiff copies of the credit card agreement relating to the Goodyear Account in April 2019, May 2020, and April 2021. R. Doc. No. 27-2 ¶ 6; R. Doc. No. 27-3 ¶ 10.
[33] R. Doc. No. 27-1 at 6.
[34] S.D.C.L. § 54-11-9 reads:
> The use of an accepted credit card or the issuance of a credit card agreement and the expiration of thirty days from the date of issuance without written notice from a card holder to cancel the account creates a binding contract between the card holder and the card issuer with reference to any accepted credit card, and any changes made with the authorization of the primary card holder.

[35] R. Doc. No. 27-1 at 6–7.

two employees of defendant with unspecified titles, in which they state that the arbitration agreements were provided to plaintiff.[36]

Plaintiff counters that defendant "fails to establish a valid agreement to arbitrate because [p]laintiff never received the arbitration provisions and, thus, could not consent to them."[37] Plaintiff submitted a declaration in which he states that he had moved from the address to which defendant sent the arbitration agreement regarding the Citibank Account, 3 N Lafourche Ct., Kenner, LA 70065 (the "Lafourche Residence"), in 2014, one year before defendant mailed the updated credit card agreement that included the arbitration agreement.[38] Plaintiff states in his declaration that his mother and brother continued to reside at the Lafourche Residence after he moved out and that they would forward him important mail, but he does not remember receiving the agreement.[39] Plaintiff argues that because the

---

[36] R. Doc. No. 27-2; R. Doc. No. 27-3.
[37] R. Doc. No. 30 at 2.
[38] R. Doc. No. 30-1 ¶ 3. According to defendant, it mailed plaintiff the agreement relating to the Citibank Account on October 15, 2025, R. Doc. No. 27-2 ¶ 6, and mailed plaintiff the agreements relating to the Goodyear Account on February 1, 2018, April 2019, May 2020, and April 2021. R. Doc. No. 27-3 ¶¶ 7, 10. Defendant has redacted the address to which the agreements regarding the Goodyear Account were sent, R. Doc. No. 27-3 at 15, and the address to which defendant mailed these agreements is unclear.
[39] R. Doc. No. 30-1 ¶¶ 4, 5.

agreement was sent to the incorrect address, defendant is not entitled to the presumption that a letter mailed to a person was delivered.[40]

Regarding the Goodyear Account, plaintiff similarly argues that he does not remember receiving the agreements.[41] Plaintiff contends that Booth and Grayot's declarations are based on their "personal knowledge of the general business practices of [defendant] with respect to its credit card accounts," not on any details specific to plaintiff or his account and, therefore, this Court cannot find that the agreements were in fact sent by defendant or received by plaintiff such that plaintiff consented to their terms.[42]

Plaintiff's arguments overlook the fact that pursuant to South Dakota law, use of a credit card constitutes consent to the card agreement, regardless of whether or not the card agreement was received by plaintiff. *Du-Phillips v. Citibank, N.A.*, No. 25-34, 2025 WL 1615329 at *10 (D. Haw. June 5, 2025) ("Other courts evaluating similar disputes with Citibank under South Dakota contract law have concluded . . . using the Citibank credit card constitutes consent to the Card Agreement. . . . Courts have determined this to be true even in cases where, as here, the party opposing arbitration claimed they didn't receive the Card Agreement."); *Doe v. Citibank, N.A.*, No. 23-8244, 2024 WL 5275508 at *3 (C.D. Cal. July 10, 2024) (applying South Dakota law and finding that the plaintiff had consented to the terms of the arbitration agreement even though the plaintiff claimed he had never received the agreement);

---

[40] R. Doc. No. 30 at 3.
[41] *Id.* at 4.
[42] *Id.*

11

*McCormick v. Citibank, N.A.*, No. 15-46, 2016 WL 107911 at *4 (W.D.N.Y. Jan. 8, 2016) (same); *Bakon v. Rushmore Serv. Ctr., LLC*, No. , 2017 WL 2414639 at *2 (E.D.N.Y. June 2, 2007) ("[A]ctual receipt of an arbitration agreement need not be proven to enforce it.") (applying South Dakota law when deciding on a motion to compel arbitration).

Plaintiff does not dispute that he used the credit cards at issue, and the nature of his claims themselves evidence that the credits cards were used because Mrs. Brolin incurred a debt on those cards.[43] Moreover, in *Tillman v. Equifax Info. Servs., LLC*, the court, applying South Dakota law, compelled arbitration even when the defendant did not contest that the plaintiff had never received a copy of the credit card agreement at issue. No. 23-1432, 2024 WL 3639586, at *4 (E.D. Mo. Aug. 2, 2024).

Plaintiff's argument regarding Grayot and Booth's lack of personal knowledge of the particular mailings sent to plaintiff also fails.[44] As discussed, receipt of a credit card agreement containing an arbitration provision is not required for an arbitration agreement to be valid. *See, e.g.*, *id.* Additionally, "proof of mailing may be accomplished by presenting circumstantial evidence, including evidence of customary mailing practices used in the sender's business." *Bakon*, 2017 WL 2414639, at *2. If defendant does not submit copies of the particular mailing sent to plaintiff, and

---

[43] *See generally* R. Doc. No. 1; R. Doc. No. 30.
[44] Notably, plaintiff alleges that he does not "recall" receiving the agreements at issue and not that he did not actually receive them. R. Doc. No. 30-1 ¶¶ 5, 7. Plaintiff also does not allege that he ever notified defendant of a change of address. *See generally* R. Doc. No. 30-1.

instead provides only an "exemplar" of the mailing, as defendant did in its motion, that "is of no consequence." *Id.* at *3.

While Grayot and Booth do state in their declarations that their statements are based on their personal knowledge of the general practices of defendant with respect to its card credit accounts, they also make statements specific to plaintiff. First, Grayot states that "[p]laintiff was provided with" the Goodyear credit card agreement "at the time he applied for, and opened, the Goodyear Account in 2018."[45] He also states that "[i]n April 2019, May 2020, and April 2021, [defendant] caused to be mailed to [p]laintiff notices of change in terms to certain terms and conditions in the card agreement."[46] Booth also declares that "[o]n or about October 15, 2025, [defendant] caused to be mailed to [p]laintiff a notice of change in terms, which included a new Card Agreement effective December 19, 2015.[47] Grayot also attaches an "exemplar" of the credit card agreement that was provided to plaintiff.[48] Booth attaches a copy of the notice of change in terms mailed to plaintiff.[49]

Even if the statements in the declarations were only made based on Grayot and Booth's personal knowledge of defendant's general business practices, and not their personal knowledge of specific mailings sent to plaintiff, these statements, the copy of the notice sent to plaintiff, and the exemplar agreement are sufficient to support a finding that defendant mailed the updated terms and conditions in the card

---

[45] R. Doc. No. 27-3 ¶ 7.
[46] *Id.* ¶ 10.
[47] R. Doc. No. 27-2 ¶ 6.
[48] *Id.* ¶ 7; *Id.* at 5–14.
[49] R. Doc. No. 27-2 at 4–20.

13

agreement to plaintiff. *See Bakon*, 2017 WL 2414639, at *2–3 (applying South Dakota law and finding that evidence of the defendant's customary mailing practices and a declaration that card credit agreements were mailed to the plaintiff was sufficient to support a finding that the credit card agreements were in fact mailed to the plaintiff); *Du-Phillips*, 2025 WL 1615329, at *8 (same); *Cox v. Brookings Int'l Life Ins. Co.*, 331 N.W.2d 299, 301 (S.D. 1983) (finding that testimony from the defendant's employees that it was company policy to mail particular pieces to the plaintiff and that those procedures were followed was sufficient to establish a presumption that the pieces were mailed to plaintiff).

Plaintiff also notes that, regarding the Citibank Account, the arbitration agreement was not part of the original credit card agreement and defendant only added the arbitration agreement in a notice of change of terms that it mailed to plaintiff on October 15, 2025 and that plaintiff does not remember receiving it.[50] The notice of change of terms indicated that the new credit card agreement, which contained the arbitration agreement, became effective on December 19, 2015.[51]

Defendant submitted a copy of a billing statement for the Citibank Account for the billing period from October 25, 2016 to November 22, 2016 that shows the credit card associated with the Citibank Account was used during this period.[52] This continued use of the credit card without opting out of the arbitration agreement is sufficient to establish that plaintiff consented to the terms of the updated credit card

---

[50] R. Doc. No. 30.
[51] R. Doc. No. 27-2 ¶ 6.
[52] R. Doc. No. 27-2 at 22–24.

agreement that included the arbitration agreement. *Doe*, 2024 WL 5275508 at *2–3 (applying South Dakota law and finding that the plaintiff consented to an arbitration agreement that was not contained in the initial credit card agreement, but was contained in an updated credit card agreement. The plaintiff continued to use the credit card after receiving the updated credit card agreement and failed to opt out of the arbitration agreement); *Guerrero v. Equifax Credit Info. Servs., Inc.*, No. 11-6555, 2012 WL 7683512, at *3–4 (C.D. Cal. Feb. 24, 2012) (same); *Haynes v. TransUnion, LLC*, No. 19-7157, 2021 WL 7906567, at *7 (E.D.N.Y. Sept. 30, 2021) (same); *Cayanan v. Citi Holdings, Inc.*, 928 F.Supp.2d 1182, 1198–99 (S.D. Cal. 2013) (same).

The Court also notes that this dispute falls within the scope of the arbitration agreements. The arbitration agreement in both the Citibank and Goodyear card agreements states that "all Claims are subject to arbitration, no matter what legal theory they're based on or what remedy (damages, or injunctive or declaratory relief) they seek, including Claims based on contract, tort (including intentional tort), fraud, agency, your or our negligence, statutory or regulatory provisions, or any other sources of law."[53]

Plaintiff's claim is one based on a statutory provision, as it is brought pursuant to 15 U.S.C. § 1681.[54] A claim such as this one that is based on a statutory provision is explicitly mentioned in the arbitration agreements as a claim within the agreements' scope.[55] No other provision of law prevents this Court from compelling

---

[53] R. Doc. No. 27-2 at 18; R. Doc. No. 27-3 at 12.
[54] *See generally* R. Doc. No. 1.
[55] R. Doc. No. 27-2 at 18; R. Doc. No. 27-3 at 12.

arbitration in the above-captioned action, and defendant's motion to compel arbitration must therefore be granted. *See Jones*, 583 F.2d at 235.

The FAA requires a federal district court to stay an action pending an arbitration, rather than dismiss it. *Tillman*, 2024 WL 3639586, at *4 (citing 9 U.S.C. § 3). This Court will therefore stay these proceedings as to plaintiff's claims against defendant pending the outcome of arbitration. *Id.*

Regarding plaintiff's claims against the other defendants in the above-captioned action, defendant does not ask to stay the entire case, only for a stay of plaintiff's claims against defendant pending the results of arbitration.[56] The Fifth Circuit has held that nonarbitrable claims against defendants who are not parties to an arbitration are only required to be stayed in the case of "exceptional circumstances." *Johnson v. S.W. Recovery Servs. Inc.*, 2023 WL 1879999, at *1 (N.D. Tex. Feb. 10, 2023) (citing *Adams v. Georgia Gulf Corp.*, 237 F.3d 538, 540–41 (5th Cir. 2001)). In order to support a finding of "exceptional circumstances" which would justify a mandatory stay: "(1) the arbitrated and litigated disputes must involve the same operative facts; (2) the claims asserted in the arbitration and litigation must be inherently inseparable; and (3) the litigation must have a critical impact on the arbitration." *Jones v. Singing River Health Sys.*, No. 14-447, 2016 WL 3351291 (June

---

[56] *See generally* R. Doc. No. 27-1.

15, 2016) (citing *Waste Mgmt., Inc. v. Residuos Industriales Multiquam*, 371 F.3d 339, 343 (5th Cir. 2004)); *Johnson*, 2023 WL 1879999, at *1.

When a mandatory stay is not required, a district court may still have the ability to issue a discretionary stay "even if the 'operative facts are not identical and the claims are not inherently inseparable' as long as the facts and claims forming the basis for the arbitration and litigation proceedings 'significantly overlap'" *Jones Walker, LLP v. Petaquilla Minerals, LTD.*, No. 14-1203, 2015 WL 37772670, at *5 (quoting *Suzlon Infrastructure, Ltd. v. Pulk*, No. 09-2206, 2010 WL 3540951, at *8 (S.D. Tex. Sept. 10, 2010)). The "question is not ultimately one of weighing potential harm to the interests of the non-signatories, but of determining whether proceeding with litigation will destroy the signatories' right to a meaningful arbitration." *Johnson*, 2023 WL 1879999, at *1 (quoting *Waste Mgmt.*, 317 F.3d at 343).

Based on the record provided, this Court cannot determine whether a stay of the proceedings by this Court is appropriate. Accordingly, this Court only stays plaintiff's claims against defendant pending the outcome of arbitration proceedings between plaintiff and defendant.

### III. CONCLUSION

Accordingly,

**IT IS ORDERED** that defendant's motion to compel arbitration and stay these proceedings is **GRANTED** and that plaintiff's claims against defendant Citibank, N.A. are **STAYED** pending the outcome of arbitration between plaintiff

and defendant. Plaintiff's claims against the other defendants will proceed and the scheduling order remains intact.

**IT IS FURTHER ORDERED** that, if appropriate, plaintiff or defendant may file a written motion for plaintiff's claims against defendant Citibank, N.A. to proceed within 30 days of the final outcome of the arbitration proceedings.

New Orleans, Louisiana, December 15, 2025

_____
LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE